FANNY (A SLAVE) VS. THE STATE.

Fanny
(a slave)
vs.
The State

1. A change of venue cannot be granted on application of the *owner* of a slave indicted for murder. The slave should petition in person for such change

2. The 2nd and 3rd sections of the act of February 6th 1836 concerning crimes and punishments, providing that any slave thereafter convicted of a *felony &c:* shall be punished by whipping, &c were intended only to substitute æ punishment in lieu of that prescribed in the repealed sections; leaving slaves still punishable with *death* for murder in the first degree.

3. Were there room for doubt on this subject, the 27th sect. of the 3rd article of the state constitution, providing that a slave convicted of a capital offence shall suffer the same degree of punishment, and no other, than would be inflicted on a free white person for the same offence, settles that doubt.

4. No *statute* shall be construed in such manner as to be inconvenient or against reason.

5. Evidence of what a witness declared on a former occasion respecting the guilt of a prisoner on trial, is not admissible to prove the guilt of the prisoner.

Appeal from the Circuit Court of Warren County.

Wells and Bates for Appellant.

1st. The circuit court of Lincoln county erred in granting a change of venue upon the application of William C. Prewitt, the master of the prisoner, and the circuit court of Warren obtained no jurisdiction by said order.

2nd. The circuit court of Warren erred in passing sentence of death on said prisoner, such sentence being without warrant of law.

3rd. The circuit court of Warren erred in over ruling the motion for a new trial. See Revised Code page 486–7, sec. 15, 16, 17 and 18. Spencer Ch. J. in Bigeloe vs. 19 J R 39–40. See also 5 J. R. 41. 8 J. R. 90. 5 Con. R. 28. 8 J. R. 149. 1 Dall. The act of the 6th Feb. 1836, page 60, repeals the 31–2–3 and 4 sections of the 9th art. of the law of crimes and punishments, R. C. p. 215. The R. Code, p. 167, art. 2, section 3, defines murder in the 1st. degree. Acts 1836, Mo. Decisions vol. 5, 1 semi-an. part p. 71. R. C. page 166, 557. See Boner's case, last reports M. R. page 379.

### Statement of case.

This is an indictment for the murder of William Florence

against Fanny, a slave of William Prewitt. The indict-
ment was found in Lincoln circuit court, the county in
which the murder is charged to have been committed, at
the November term of said court 1838. The defendant
was arraigned and pleaded not guilty. At the same time,
on the petition of Wm. C. Prewitt, the master, the court or-
dered a change of venue to the county of Warren. At the
April term of the Warren circuit court 1839, the prisoner
was tried, found guilty of murder in the first degree and
sentenced to death. From that judgment the defendant has
appealed to this court. After verdict a motion was made
for a new trial and over ruled by the court. A bill of ex-
ceptions was filed, excepting to that decision by which all
the evidence in the case was saved, the order for a change
of venue is as follows: "Now at this day William C. Prew-
itt, the master and owner of said slave Fanny, personally
appears in open court and files his motion and affidavit for a
change of venue in this cause. It is thereupon ordered by
the court that the venue in this cause be changed to the
county of Warren in this State, and that the clerk of this
court make out and transmit to the clerk of the circuit court
of said county of Warren a full transcript of the record and
proceedings in said cause, with all the original papers filed
in said cause and forming a part of the record thereof."

Ellick, a witness, stated that he was acquainted with
William Florence, son of Mr. Wm. Florence; that William
the younger was about 9 or 10 years old as he supposes;
that on Saturday, sometime in September last he thinks,
William and Thomas (another younger son of Mr. Flor-
ence) were missing; that Mr. Florence told him so that
evening at his masters house; that he saw the children no
more until the next Tuesday, when he saw their dead bodies
after they were found; that he does know how they came
by their death, and does not who killed them; that on the
day they were missing he was in his masters orchard sever-
al times, and about the house; that he did not see Mr. Flo-
rence's children that day nor for several days previous; that
his mother never told him that she had killed the children;
that his mother did not tell him that she had seen them, that

OCTOBER TERM
1839.

Fanny,
(a slave)
vs,
The State.

OCT. TERM
1839.

Fanny,
(a slave)
vs.
The State.

day; that Fanny, the prisoner at the bar, is his mother; that he knew nothing of either killing or hiding of the children. He also swore that, on the day the children were found, he and his mother Fanny and his father Ben and his uncle Green were all arrested and taken into custody, and that on the next day he was taken out from the rest by Mr. Sitton the sheriff, and by Mr. Hammond, and they told him if he did not tell who killed the children, they would hang him; that if he would tell they would let him off; that he told them he knew nothing about it; that they then put a rope around his neck and hung him; that he then told them that his mother had told him that she had killed the children in the orchard, when they came for peaches; that after this, on the same day, the prisoners were taken to Mr. Lawrence Sittons, and he and Green were set at liberty; that a few days after he was taken up and sent to Troy to jail; that after he got there, Mr. Chandler, the jailor, told him that he knew more about killing the children than he had told, that he had helped to kill them himself: that Mr. Chandler then told him that Judge Hunt had hung his father Ben at Bowling Green, and had come by his masters, and hung Green, and had then just taken his mother out to hang her, and that if he did not tell all about the killing the children, Judge Hunt would be there directly and hang him; that if he told they would let him off; that Mr. Chandler then put a rope on his neck, and that a man came in with a cloak on, who Mr. Chandler said, was Judge Hunt. He says the man they called Judge did not say any thing. He also says that he then told Chandler that he helped his mother to kill the children; that he and his mother carried them off into the woods. He says he also told the same story before the grand jury, after he had been sworn on the book; that the reason why he told the grand jury so was, that he had once said it, and he thought he was bound to stick to it; that neither the story he told Sitton and Hammond, nor the one which he told Chandler and the grand jury was at all true; that he told both in consequence of the threats and hanging above mentioned, and states that he knows nothing about the killing of the children.

OCTOBER TERM
1839.

Fanny
(a slave)
vs,
The State.

Mrs. Florence states, that about half past two o'clock in the evening on Saturday, the 1st day of September 1838, William and Thomas Florence, sons of hers, left her house to go to William C. Prewitt's peach orchard, for the purpose of getting peaches; that they, before they started, made several requests to her for permission to go before she consented to permit them to go; that Prewitt's peach orchard was about one quarter of a mile from her husbands residence from whence her aforesaid sons started; that she noticed them some distance on the way to the orchard, as far as she could see them, at least one hundred yards from the house; that her husband William Florence, had left home on the same day to go to Auburn about two miles distant, about two o'clock, and did not return until about one hour by sun; that by this time she had become uneasy about her chileren, and told her husband of it, and the circumstances and facts of her children leaving; that her husband immediately started to Prewitt's orchard to see about the children, and returned without having found them. She stated that a short time before Mr. McMahill, on the evening, passed for a load of bark, the children left for the orchard; that she never saw them afterward. She states, upon cross examination, that Aaron, a negro boy belonging to her husband, was never at any time, from the time her husband left home for Auburn on that day until he returned, out of her sight more than fifteen minutes; that her husband owned a horse mill, and that some time after the children had left for the orchard, about three o'clock, not particular as to the time, Mark, a negro boy belonging to Dr. McClure, came to said mill; that he hallooed for Aaron, and that Aaron came in about 10 or 15 minutes from that time and went to the mill; that she was unwell that day and, as soon as her husband had left for Auburn, and her children had left for the orchard, she called said Aaron to the house from a field where he was taking care of fodder, under his masters direction, and directed him to make a fire and bring her water, which he did accordingly; that she then sent him to the field again, and, after he had been gone some 10 or 15 minutes into the field, it was that Mark came to the mill and soon after he

OCT. TERM
1839.

Fanny
(a slave)
vs,
The State.

hallooed; that Aaron was at the mill; that William was about eight or nine years of age; went off without hats on.

William Sitton states; that on the 4th day of September 1836 a warrant was put into my hands to apprehend Prewitt's negroes. The negroes, to wit, Ben, Green, Ellick and Fanny, the prisoner, were then under guard at Prewitt's house. I took charge of them and they were guarded that night. Next morning (Wednesday) I went over to Prewitt's and took Ellick out, and set down with him under a shade, about 60 yards from the house. Mr. Hammond came up and asked him a few questions, he said he could show us the club.

[Here the counsel for the defendant objected to any conversation of Ellick's being given in evidence. The court decided that no statement of Ellicks as to what the prisoner told him were to be given as evidence of her, the prisoner's, admissions, but that any thing stated by Ellick, which led to the discovery of facts, might be given by the way of inducement to lead to their further search into circumstances and facts.]

The witness proceeded; Ellick said he could show us where they were killed, the club they were killed with, that it was a piece of a horse yoke, that he had seen it in the orchard on Sunday. We went on where he said the club was but could not find it. Ellick said he could show us where they were taken out of the orchard; he said three rails were laid down where they were taken out. We went on and he showed us a gap on the western side of the orchard, there the rails appeared to be recently moved; he said he could show us blood where he saw it on Sunday. We went on but saw none. I then told him to go right on the way the children were carried over, and as he went, I broke the hazle bushes, intending to take another look; when he got through the hazle patch, west of the orchard, the boy Ellick then said he knew nothing further, but that his mother said she had laid them in a sink hole. We then took him back to where he said the children were taken over the fence, and then left him. I then went to the house where there were 50 or 60 men. As I went on to the house, I went by

the places where Ellick said he had seen the children, and on
a close examination I found on the under side of a blade of
grass, one drop of blood about as large as a pinhead, under
the peach tree where the boy said they were killed, and
where he said the club was. I took it up, wetted it, and
found it was blood. I told the men at the house, that the
children were, or I believed they were, murdered in the or-
chard; that I had found blood. I formed the men in a col-
umn. I did not tell them where the blood was. As soon
as they got to the place where I found the drop of blood,
several of the men cried out, "here is blood," "here is blood."
Mr. Sanford first cried out. I went and looked at what
they called blood, and did not think it was blood; it looked
red, but I did not take it to be blood. Hans Smith cried out,
"there was blood on the fence." On the next rail to the
bottom there was a place of blood, about as wide as my fin-
ger. The rail bent over and this was rather on the under
side; right in front of that about a foot from the fence there
was a place that looked like it had been rooted out by the
hogs, another place, about six or eight feet from that, look-
ed like it had been rooted out by the hogs, and near where
I found the first drop. These holes looked like blood mixed
with the dust. I could not say it was blood. About a foot
from where I found the first drop, as I went to the house, I
now found blood on two other blades of grass. I did not
take particular notice to this. This was on the east side of
the orchard; the blood on the rail was under a peach tree.
I then went on to the place where I had broke the hazle
bushes in the woods, and there I found blood, at four or five
places between the gap and where Ellick took us, on the ha-
zle leaves. This I know was blood; I showed it to no one,
that I recollect of. Howdershill showed me some blood he
found on a leaf. The men were all formed in a column, and
were frequently crying out blood in different places. I saw
what others took to be blood, but I did not think it was
blood; I took it to be the spots on the leaves; these were
briar leaves and red on both sides. Where I found blood in
the woods was about a quarter of a mile from the place
they were murdered, and in a straight course from the

OCTOBER TERM
1839.

Fanny,
[a slave]
vs
The State.

blood in the orchard, to where the bodies were found. Cross examined, stated; I and Hammond used no violence to compel the boy Ellick to confess; he made his confessions to us voluntarily. Ellick said he knew nothing but what his mother told him, after we went to the place where he said he saw the club, we could not find it. We then went to where he said he saw blood, but we saw none at that place. We then put a rope around his neck to make him tell where the sink hole was where she hid them. We choked him a little but became satisfied he knew no more about it. The witness also stated in his chief examination that at the place in the orchard where he saw blood there was a place where the blood appeared to have been attempted to be washed off the grass; the dust was spattered on the grass, and appeared to be mingled with blood; it was a dry spell of weather and the ground was dry and dusty, the peach tree at the place where the blood was on the fence had good peaches on it.

John Hammond says, that on Wednesday the 5th day of September 1838, I went to Mr. Wm. C. Prewitt's in Lincoln county. The prisoner and other negroes of Prewitt's were in custody. I saw Mr. Sitton sitting under a shade with Ellick. We took him out over a fence about 150 yards into a woods pasture. I asked Ellick to tell me the truth, I tell him I had always thought him a truthful boy and wanted him to tell me the truth. He said he could show us where the children were killed, that he could show us blood on the grass. We went to the place but could see no blood. Ellick said that his mother had taken them out at a gap. He said he had seen blood on Sunday, but I saw none where he said his mother had carried them out. I did not see the club. I dont recollect of seeing any sign in the woods.— This was the day after the bodies of the children were found. The boy Ellick said he could show us the club. I first asked him if he knew who killed the children, he said no, but afterwards said his mother told him she did. As he went on to show us the place and club, he said his mother said she struck one, knocked it down and killed it; that she did not aim to kill it; she then killed the other. I saw the blood

OCT. TERM
1839.

Fanny,
(a slave)
vs,
The State.

on the rail; it was near the ground, on the rail next the bottom, on the east side of the orchard, about 150 or 200 yards from the gap where he said they were taken out. The gap is on the west side of the orchard, not exactly in the direction to where the children were found.

Cross examined. I saw no blood till I came back out of the woods. I saw no blood in the woods or nothing that I was certain was blood. I saw what others called blood, but I did not think it was blood. Our object in taking Ellick out was to get out of the crowd. We used no violence with Ellick, till he had confessed. We then put a rope round his neck to make him tell where the sink hole was.—We choked him a little but became satisfied he knew nothing about it.

William Howdershill, a witness, says that on the day after the children were missing (on Sunday) he went with Mr. Williams to hunt for the children. We went to Prewitts orchard and I looked about some stacks for them. I expected they had been killed. In Prewitts orchard, about 200 yards from the house, on the east side of the orchard, I picked up a club, and showed it to Mr. Williams. It was a dry hard smooth piece of hickory, 3 or 4 feet long, and turned up a little at the end. I picked it up and threw it down and told Mr. Williams it was a handy stick and explained by saying it was a handy stick to kill a child. The club was under a peach tree that had good ripe peaches upon it. I left the club there. On Wednesday I was there, and Sitton formed the men in a line in the orchard, except the the guard who guarded the negroes. Sitton told them where he had seen blood. I saw the blood on the second rail of the fence from the ground opposite to where I had seen the club on Sunday. The club was not there; I dont know what had become of it. The stick I had seen there looked like it had been part of a yoke. I saw something like blood that water had been thrown on. Saw something like blood in two or three different places. I saw blood in the woods where the boy said his mother had thrown the children. I saw the gap where the boy said his mother had taken the children out. The fence looked like it had been

I

lately pulled down. The rails appeared to be moved out of their places. The blood on the rail in the orchard, where I had seen the club, looked like it had been wiped or splashed on. The rail shelves over and it was on the under side six or seven inches from the ground. I saw a place 8 or 10 feet off that looked like water and something mixed up. After I had seen the club on Sunday, I went over to Mr. Florence's, and mentioned to a good many my finding the club. I several times talked of it afterwards. The peach tree, on which the peaches were, and under which the blood was on the fence, stood near to the fence.

Doctor McClure stated. The children were found dead about 1½ miles from Florence's, in a westwardly direction about 2½ miles from Prewitt's orchard in a direction south of west therefrom. The children were both naked. I examined the head of William Florence the elder child.— There was a sunken place on the right side of the head running upwards; the sunken place or indentation in the skull was about two inches in length, and in the bottom of it, there was a small hair crack in the skull, about ¾ of an inch in length. I examined the head and found no other marks of violence. The body having lain under water was in a state of preservation. I could find no marks of violence on it. I do not think the blow was sufficient to produce death ordinarily. I have seen skull bones more materially injured, where the patients recovered. I think the blow would have produced insensibility. Perhaps, if the patient had not had medical or surgical assistance, such a wound would have produced inflammation, from which death would have ensued in a few days. It could not have been given with a long stick if the child had been on the ground. It might have been given if the child had been standing above the person striking or lying on the ground. It must have been given with a weapon having a smooth surface as the skin was not broken; a rough surface would have cut the skin. The other child had no mark of violence, as I could see, except several bruises or contusions on the head varying from the size of a 4½ pence to a quarter of a dollar. The skull was not injured. The flesh had been eaten off the face, throat,

chest and arms of the child, so that no discovery could then be made. On examining the head of William Florence, the larger of the two boys, I saw a speck of blood; whether it proceeded from the nose or followed the knife I am not able to say. Such a blow, and even a much lighter one, would produce an issue of blood from the nose, or mouth. A blow that would not fracture the skull might produce blood sometimes at the mouth or ear.

William Florence a witness states, that on Saturday the 1st September 1838, I left home about 2 o'clock to go to the post office, before I left, my children asked my permission to go to Prewitt's orchard. I told them they should not go, that them negroes had threatened to kill them; and if they did go I would whale them. I then went on to Auburn, and returned about one hour by sun. So soon as I got home, or within thirty or forty yards of the house, I saw my wife coming out, and she asked me if I had seen any thing of the two children; I told her no, and asked her where they were. She stated that they had left home about 30 minutes after I did, and said they were going to the orchard to get some peaches. I got off my horse and threw my bridle over a stake, and started directly to the orchard. I went to it but did not see my children. I then went to Mr. Prewitt's house and called out the prisoner Fanny. She poked her head around the house, and I asked her if she had seen my children? She said she had not, and then drew back. I called her again and then asked her if she had been to the orchard that day? She said she had not. I asked for Ellick; she said he was down the hill. I told her to call him and ask him if he had seen them. She did so, and said that he said that he had not. By this time Ellick came running up the hill, and came within a few steps of me and stopped. He looked as wild as a deer. I then asked him if he had seen my children? He answered that he had not. I then asked him where he had been ever since about dinner time of day? He answered that he had been up about the orchard and about the house. I then discovered from their deportment that my children had been murdered by them. I then went home and told my wife so. I had

OCT. TERM
1839.

Fanny,
(a slave)
vs.
The State.

been living near Mr. Prewitt's about 4 years, and have been acquainted with the prisoner Fanny ever since. I had frequently been at Mr. Prewitt's and enquired of her for Mr. Prewitt and she would come out and stand and talk to me. On this occasion, she poked her head around the corner of the house. On this occasion she looked so different from what she always did, that I felt satisfied she committed the murder or knew who did do it. Mr. Prewitt was from home, and no person there except the said Fanny, Ellick and some children. On the next day. Sunday, I saw the stick which Howdershill saw, before Howdershill saw it.— I, on Wednesday, saw the blood on the rail, and the grass. I do not know except from information given by my children, that Fanny had made any threats against my children. I saw what I know to be blood in one place. There were about 70 or 80 persons in the woods scattered about one hundred yards, and one would cry out "here is blood," and another would cry out "here is blood," but I knew there was not blood in some places; they said there was. I saw nothing on Sunday except the stick that I have spoken of.— The place where the children were found is about $2\frac{1}{2}$ miles from the orchard.

On cross examination he said, I do not know whether she, Fanny, was washing her clothes or not, nor how she was clothed that evening, for I did not see her body. I saw a kettle or pot with a little fire under it, which looked like some negroes had been washing or were washing. On cross examination, witness was asked if the agitation and alarm which the prisoner manifested when he (witness) accosted her, and she answered him as above stated, were not produced by his (witnesses) excitement? To which he replied, no! that he was not excited till after he saw her (prisoner); that he expected to find his children there and expected she was alarmed at the sight of him.

Elizabeth Howdershill, a witness, stated, that she went over to Mr. William Florences on Sunday morning, and found Mrs. Ware there, and we proposed to go to Mr. Prewitt's orchard, and get some peaches. We went on to the house and asked the prisoner, Fanny, if there were any

good peaches in the orchard. She said there were none, for she had been in the orchard the evening before, and there were none. I told her that I expected that people who had taken them and eaten them, would eat them no more. She then stated that Mr. Florence had accused her children. of killing his. I was not acquainted with her, never saw her before; she looked to be in great trouble; had nothing to say; seemed to be mortified; she just sat down and said nothing; seemed to be condemned right off.

On cross examination, she stated, I saw flies near the spot where the gentlemen saw the sign. The flies were green flies; there were a great many flies about the spot. I knew that the flies were on the spot where the sign had been seen, because they (the people) told me so. When I saw the flies we got scared, and ran away. This orchard was a place to which the people of the neighborhood generally went to get fruit. Shortly after we returned from the orchard, Mr. Florence came, and said he suspected Prewitt's negroes.

Mrs. Ware says; I went with Mrs. Howdershill to Mr. Prewitt"s on Sunday morning to get some peaches. We asked Fanny, the prisoner, if there were good peaches in the orchard? She said, no; that she had been in the orchard the evening before, and there was none fit to eat; they had been eaten by them that would eat them no more.— That Mr. Florence had accused her (Fanny's) children of killing his, and said no more. I saw the flies spoken of by Mrs. Howdershill. I did not notice Fanny much; her face was tied up, and she said she had the toothache. I and Mrs. Howdershill went to Prewitt's in the forepart of the day.— We had been up all night. I do not know whether Mrs. Howdershill spent the night before at Mr. Florence's or not. I asked Mrs. Howdershill if she would take a walk. We passed about in different directions in the orchard, thinking that we might find the children but saw nothing of them.— There were two negroes there eating dinner when we got there.

Burton Parmer, a witness, says; I was the first person who found the children. There was five or six hunting, I discovered buzzards and told the company, who were out

OCTOBER TERM 1839

Fanny,
a slave)
vs,
The State.

with me, that we would stop and see what they were doing. I saw one fly up out of the creek. I rode to the bank; it was high. I went down to the hole of water; I saw a bunch of hair, a little lump; I also saw an arm out of the water, eaten by the buzzards. This was the smallest boy, Thomas. He was mostly covered. The largest boy, William, was entirely covered. There was a large rock on the hip one that appeared to be put on to hold him down, till gravel and sand were put on. The largest was near the bank closely fitted to the bank, the smallest next to him. The water in the hole was about 18 inches deep. The water had fallen some and appeared to be falling. There were several rocks laid on the children. I could see where they had been pulled out of the clay bank, from the shape of the rocks, and the holes from which they were taken. They appeared to be put on by design not by accident. The rocks were taken out of the second bank. They were found one and a half hours by sun, on Tuesday. I told Mr. Sitton where they were found, near the corner of an old place. Sitton knew the situation of the place better than I did. The children were entirely naked, as to clothing when found. The place was not over 100 yards from the Jefferson road. *I* did not search for their clothes, nor do *I* believe there was any search made. *It* was talked of but not done that *I* know of.

The court instructed the jury the same, in substance, contained in the first instruction after the close of the evidence, to wit, that statements made by witnesses on the trial of this cause of what Ellick, another witness, heretofore said to them (said witnesses) in relation to declarations of the defendant to him, said Ellick, are not legal evidence, in this cause against the defendant; and that they should wholly disregard such evidence in making their verdict in this cause.

### Defendants Evidence.

Robert M'Mahill, a witness, states that, on Saturday the first day of September 1838; he was engaged hauling tanbark for a Mr. Read; that he passed the house of Mr. Florence, also the house and orchard of Mr. Prewitt; that he

usually hauled three loads a day; that in the early part of
the day his own children went with him to Mr. Florence's,
and as he returned with his second load, his children left
Florence's and went to Prewitt's orchard; that he went on
to the orchard with the second load, and when he got to
Read's, they had eaten their dinner; that he (witness) ate his
dinner, and immediately returned briskly by the orchard
where he saw no one either in the orchard, or about Prew-
itt's house, which was 150 or 200 yards from the road; the
road run near the fence of the field in which the orchard
was; about 100 or 150 yards from the orchard; this was in
the afternoon, but he is unable to say pecisely at what time·
He went on by Mr. Florences, which was about one quar-
ter of a mile farther, on his road, than the orchard. As he
passed Florence's, he saw Mr. Florence's two little children,
William and Thomas. They inquired of him, if his chil-
dren were at Mr. Prewitt's orchard; he told them, they
were not. The boys said they were, and that they would
go there. They started on towards the orchard. The last
he saw of them they were going on, and were 50 or 60
yards from the house near the mouth of Mr. Florence's lane·
He went on a mile or two and got his bark and returned.—
He was hauling in a small two horse wagon, and went
briskly. When he returned, there was some one grinding,
at Mr. Florence's mill, he thinks, one hour and a half by sun.
As he passed, Mrs. Florence requested him, if he saw her
children at the orchard, to tell them to come home. He
went on by the orchard, but did not see them. As he pas-
sed, Prewitt's place, below the house, he saw three little ne-
groes, coming up the branch out of the woods, and near the
road he travelled, and which was 150 or 200 yards from
Prewitt's house. One of the boys appeared to be 13 or 14
years of age. He called to them and inquired if they had
seen Mr. Florence's children that evening? They answered
that they had not. Where he last saw Mr. Florence's chil-
dren, when he went out they were in the lane 40 or 50
yards on their way to the orchard. I was with the men in
the orchard the day after the children were found. I saw

OCT. TERM
1839.

Fanny
(a slave)
vs,
The State.

OCT TERM
1839.

Fanny
(a slave)
vs.
The State

what was by some thought to be blood.  It was red spots on leaves which I did not think was blood.

Mark, a slave, a witness, says; I went on the Saturday evening, on which Mr. Florence's children were missing, to Mr. Florence's mill.  I started about two o'clock in the evening.  I passed Mr. Prewitt's orchard, on my way to the mill, and travelled the road from there to the mill on which the children must have gone, if they travelled any road to the orchard.  I did not see them on the road nor in the orchard.  When I got to the mill I saw nothing of Aaron, Mr. Florence's slave.  I rode up and asked for him, and was told that he was in the field getting fodder.  I then called him several times but he did not come.  I then hitched my horses to the mill and attempted to grind my corn, but could not get along with it, because they had been grinding wheat in the mill, and I could not drive my horses and set the mill.  Aaron did not come according to my judgment for one hour and a half after I got there.  I saw Mr. M'Mahill, after he returned with his load of bark, and think my corn was nearly ground out at the time.  When Aaron came I asked him where he had been?  He said he had started to Mr. Sitton's orchard to get some apples.  I asked him if he heard me call him?  He answered that he did, and turned back before he got there.  I think that Lawrence Sitton's orchard, to which he said he started, is not more than a quarter of a mile from Mr. Florence's.  When I was about to start home, Mrs. Florence requested me to tell her children, if I saw them to come home.  As I passed Mr. Prewitt's orchard, I looked over it, but saw nothing of her children.  I saw a boy coming into the orchard, which I took to be a son of Mr. Teague.  He was too large for William Florence.  After I passed the orchard and got down to the branch nearly opposite to Mr. Prewitt's house, I saw Ellick and some negro children at play in the road.  I asked Ellick, if he had seen Mr. Florence's children? and he told me he had not.  Lawrence Sitton's orchard is a contrary direction from Florence's from the direction of Prewitts orchard.  I did not see Mr. M'Mahill pass out after tan bark, after I got there.  I think he came back in about an hour after I

got there and before I got done grinding. I went home from the mill before Mr. Florence came home, I think about three quarters of an hour by sun.

OCTOBER TERM
1839.

Fanny
(a slave)
vs,
The State.

William Whitesides, a witness, says; I was not present when the slaves of William C. Prewitt were arrested, but went to the company on Wednesday morning, the day after they were arrested, to look for blood. I saw the holes which had been rooted by the hogs, and saw what some thought was blood about them, but could not tell what it was; do not believe it was blood. I did not go to examine the rail on which blood was seen. I then went with the company to the woods to examine for blood. We were formed in a line and moved about towards the west. I was at the extreme left of the line. Many men in the line frequently cried out "here is blood," but it was not. I was in the orchard on Monday, and on Monday my nose bled much, but whether or not it bled when in the orchard I do not recollect. I was also in the same woods, in which the blood was found, on Monday, the day on which my nose bled, but do not know that I passed over the same ground or not, or whether or not it bled while I was in the woods. I do not think that I was as far in the woods on Monday as the place at which they said they saw blood. It bled excessively on Monday, but know that the blood on the rail did not come from my nose; my saddle and blanket and horses neck were covered with blood which came from my nose. When in the woods, I went to examine for the sink hole, found one about half a mile from Prewitt's on a line from where they saw blood in the woods, with the place where the children were found. I examined the sink hole, but could find no signs of any thing having been in it.

Robert Prewitt, a witness, says; I had the charge of the farm and negroes of William Prewitt during his absence. I have often taken down the fence at the gap, where the children are supposed to have been taken out, and I was generally at the farm at least twice a week, during his absence. I was shown the place where the boys were found. I altered some pigs in the pasture near the house some few days before the children were missing, perhaps 20 or 30 in

OCT. TERM 1839.

Fanny,
(a slave)
vs.
The State.

number. The fence was open from the pasture, near the house, into the orchard. Two or three days after the children were found, Mr. Sandford showed me a rail in the orchard fence on which there was blood, at the place where the children were supposed to have been killed. It was blood I have no doubt. The splotch on the grass I supposed to be the urine from some animal, which had fed on clover. The place rooted up by the hogs looked like a place where hogs had been salted. I saw no blood there. I salted hogs in the field near the house. I conversed with Mr. Sitton some time afterwards, and Sitton told me that he at first thought he saw blood in the woods, at the place described by him, but that he had become satisfied that he was mistaken and that there was no blood in the woods.

Cross examined. I am the uncle of the owner of the slaves. I altered the pigs some time in the week before the one in which the boys were missing. It was a dry time there had been no rain for same time. I could not tell where the rooting had been done. I saw no other places rooted than the two mentioned by the witnesses, one of which was just under the blood on the fence, the other 8 or 9 feet from that. Seven or 8 yards from the peach tree, I saw a sploch. It rather ran down hill, this I did not think blood, but it looked like clover urine. The clover was eaten out at that time. He had not pulled the gap down since the fall before the supposed murder.

Thadeus Sanford, a witness, sworn on the part of the defendant, says; I saw a place on the fence, a red sploch of blood, about 1½ inches in breadth and 3 inches long, running up from the bottom of the rail. I saw blood in no other place. I went into the woods and examined leaves, on which there was said to be blood. I did not think it blood; the place on the fence had the appearance of blood. The urine of hogs, fed on red oak mast, looks red, but this was not mast season; horse urine generally kills grass. The gentlemen in every direction in the woods were crying blood I did not deem it blood. There was great excitement. That on the fence over the hole had the appearance of a hog having rooted it on with his nose. I went with my father

and found no hole but this, and one in the grass. There
were hogs in the field. There was no water in that field.

Cross examined. I know of two sink holes in the direction from the peach tree to where the boys were found, in brushy places. I went into them but saw nothing.

Green, a slave of William C. Prewitt, says; that, at the time the children were missing, he lived at Robert Prewitt's; on Saturday the day the children were missing, he was all day at R. Prewitt's until after sun down; he came up to Wm. C. Prewitt's after sun down, and staid a short time; Ben, another slave of his master, was there at the house; that Ben had been at work that day for Mr. Sanford, and had come home; witness staid a short time and returned to R. Prewitt's, where he staid all night; next morning he returned, and he and Ben went out to hunt the children in company with others; they separated and hunted for sometime, and came home where he found Ben there before him.

The defendant here closed his evidence. Plaintiffs rebutting evidence. William Florence. I am the owner of a horse mill, it will take from ¾ of an hour to 2 hours, according to the team and condition of the mill, to grind two bushels. The place where M'Mahill lives is from 1 to 2 miles from my house. M'Mahill rather weak and decriped. The ground is sink holy from where the boys were said to be taken out of the field to where they were found. The work left the boy Aaron to do, would take two hours; it was to bring fodder together. Aaron is a boy of good character; I raised him: he had no grudge against the children. The work. left him, was done, as the boy told him, and as he found to be true on Monday morning. Sitton's orchard is 300 yards from Florence's field in an opposite direction from Prewitt's. Witness left for Auburn at 2 o'clock.

William Sitton, called again. says; he did tell Robert Prewitt that he had found blood in the woods, and that he swore, before the justice that he saw blood in the woods, the column in the woods was 70 yards long, he in the centre; Smith and Howdershill with him on the trail; Howdershill is an old hunter. We examined together for blood, and

both found blood, the red splotch was 10 or 12 yards from the rooted holes in the orchard.

Fanny
(a slave)
vs,
The State.

Joseph Howdershill sworn, says; the fence at the gap, where the children are supposed to be taken out, appeared to have been fresh removed; and this was all the evidence given in the cause.

The defendant by her counsel then moved the court to instruct the jury as follows: "State of Missouri vs. Fanny a slave, an indictment for murder of William Florence. The prisoner by her counsel, moves the court to instruct the jury.

1st. That statements made by witnesses on the trial of this cause of what Ellick, another witness, heretofore said to them (said witnesses) in relation to declarations of the defendant to him said Ellick are not legal evidence in this cause against the defendant, and that they should wholly disregard all such statements in making up their verdict in their cause.

2nd. That no evidence given in this cause of confessions of the defendant, unless such confessions, were made directly by the prisoner to the witnesses giving the evidence in their hearing, should be regarded by the jury in making up their verdict in this cause.

3rd. That no evidence given in this cause of threats made by the defendant, unless such threats were made directly to winesses giving the evidence or in their hearing, should be considered by them in making up their verdict in this cause.

4th. That unless the evidence offered in this cause, apart from the evidence decided by the court to be illegal evidence, should satisfy their minds of the guilt of the defendant beyond a reasonable doubt, that they should find the defendant not guilty.

5th. That if they entertain reasonable doubt on any material fact, necessary to make out the guilt of the defendant they should find the defendant not guilty.

The prisoner's counsel presents the following points for the consideration of this court.

1st. The circuit court of Lincoln county erred in grant-

ing a change of venue upon the application of Wm. C. Prew-
itt, the master of the prisoner, and the circuit court of War-
ren gained no jurisdiction by said order.

2nd. The circuit court of Warren erred in passing sen-
tence of death on said prisoner, such sentence being with-
out warrant of law.

3rd. The circuit court of Warren erred in overruling the
motion for a new trial.

*Tompkins Judge.*

1st. the change of venue from Lincoln county to Warren
being made on the petition of the master and owner of Fan-
ny, that error was not in my opinion cured by her appear-
ance and subsequent defence before the circuit court of War-
ren county. She was a slave and it is only in the presence
of the court that the law can regard her as a free agent. In
a capital case I do not believe that the assent of a free man,
even, ought to be implied to a change of venue, but he ought
to petition in person as required by law.

2nd. It is contended by the prisoner's counsel, that capi-
tal punishment cannot now be inflicted on a slave, and that
the first section of the second article of the act concerning
crimes and their punishment is, so far as slaves are concern-
ed, impliedly repealed by the second section of the act amen-
datory of the act concerning crimes &c. approved Februa-
ry 6, 1836, see p. 60 of the session act. By the first section
of this amendatory act, the thirty-first, thirty-second, thirty-
third and thirty-fourth sections of the ninth article of the
act concerning crimes &c. above mentioned are repealed,
and by the second and third sections of the amendatory act
it is provided, that when any slave shall be convicted of a
felony, such slave may be punished with stripes to which
may be added transportation. It is certain that murder in
the first degree of which the prisoner was convicted, is a fel-
ony. The sections of the ninth article, above mentioned as
repealed, provided for the punishment of slaves convicted
of a felony, for which they were sentenced to the peniten-
tiary; it is then a reasonable presumption that the second
and third sections of the amendatory act were intended to

*Margin notes:* A change of venue can not be granted on application of the owner of a slave indicted for murder. The slave should petition in person for such change. The 2nd & 3rd sections of the act of February 6th 1836 concerning crimes & punishments, providing that any slave thereafter convicted of a felony &c. shall be punished by whipping &c. were intended only to substitute a punishment in lieu of that prescribed in the repealed sections; leaving slaves still punishable with *death* for murder in the first degree.

OCTOBER TERM
1839

Fanny,
(a slave)
vs
The State.

Were there room for doubt on this subject, the 27th sect. of the 3rd article of the state constitution, providing that a slave convicted of a capital offence shall suffer the same degree of punishment, and no other, than would be inflicted on a free white person for the same offence, settles that doubt.

No statute shall be construed in such manner as to be inconvenient or against reason.

Evidence of what a witness declared on a former occasion respecting the guilt of a prisoner on trial, is not admissible to prove the guilt of the prisoner.

substitute a punishment in lieu of that prescribed in the repealed sections. It is not then reasonable, to believe that the crime to be punished under the substituted law was any other than that furnished under the repealed law. Why should the legislature wish to punish a slave, for the same offence more lightly than a free man? for a free man is still punished with death for murder in the first degree. No statute shall be construed in such a manner as to be inconvenient or against reason. 4 Bac. ab. 652. Were there room for doubt, on this subject, our constitution settles that doubt. The 27th section of the 3rd article of that instrument provides that a slave, convicted of a capital offence, shall suffer the same degree of punishment and no other than would be inflicted on a free white person for the same offence. The framers of the constitution anticipated probably that the legislative power might prescribe a heavier punishment to be inflicted on a slave than on a free white person guilty of a capital offence. This point then in my opinion must be decided against the prisoner.

3rd. The testimony of Sitton, so far as it details the declaration of Ellick, is altogether inadmissible against the prisoner. Had Ellick been himself on trial any confessions extorted from him by improper means, might have been given in evidence against himself if they led to the discovery of evidences of guilt.

4th. Abstracting from the evidence on the record the declarations extorted from the boy Ellick, there does not in my opinion remain any evidence to justify a jury in finding the prisoner guilty. The judgment of the circuit court ought then in my opinion to be reversed, for these reasons.

1st. Because the prisoner did not petition for a change of venue.

2nd. Because Sitton's testimony of the declarations of Ellick were suffered to go the jury.

3rd. Because that court, if the cause had been properly before it, ought to have granted a new trial.

The cause ought in my opinion to be remanded from the circuit court of Warren to that of Lincoln county.

NOTE.—The president of the court undertook to write

this opinion; and I wrote the notes printed under my name, expecting that the court would not concur in opinion on all the points made and discussed at the bar. The court however thought proper to adopt my notes as their opinion and as such they are printed. The statement of the case was not made by me but by the clerk.